UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

RECEIVED
JUL 18 2023
AT 8:30 _____ M
CLERK, U.S. DISTRICT COURT - DNJ

| | |
|---|---|
| UNITED STATES OF AMERICA | Hon. Tonianne J. Bongiovanni |
| v. | Mag. No. 23-3038 |
| ELIYAHU ("ELI") WEINSTEIN, a/k/a "Mike Konig," ARYEH "ARI" BROMBERG, JOEL WITTELS, SHLOMO EREZ, and ALAA HATTAB | CRIMINAL COMPLAINT |

I, Anthony Bellitti, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

### SEE ATTACHMENT A

I further state that I am a Special Agent of the Federal Bureau of Investigation, and that this complaint is based on the following facts:

### SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

_____
Anthony Bellitti, Special Agent
Federal Bureau of Investigation

Special Agent Anthony Bellitti attested to this Complaint by telephone pursuant to F.R.C.P. 4.1(b)(2)(A) on this __18__ day of July, 2023 at

_____
HONORABLE TONIANNE J. BONGIOVANNI
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### COUNT ONE
### (Conspiracy to Commit Wire Fraud)

From in or around January 2022 through in or around July 2023, in the District of New Jersey, and elsewhere, the defendants,

**ELIYAHU ("ELI") WEINSTEIN, a/k/a "Mike Konig,"
ARYEH "ARI" BROMBERG,
JOEL WITTELS,
SHLOMO EREZ, and
ALAA HATTAB,**

did knowingly and intentionally conspire and agree with each other and others to devise a scheme and artifice to defraud investors, and others, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and, for the purpose of executing such scheme and artifice to defraud, did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, certain signs, signals, and sounds, for the purpose of executing such scheme and artifice, contrary to Title 18, United States Code, Section 1343.

In violation of Title 18, United States Code, Section 1349.

## COUNT TWO
### (Conspiracy to Obstruct Justice)

From in or around December 2021 through in or around July 2023, in the District of New Jersey, and elsewhere, the defendants,

**ELIYAHU ("ELI") WEINSTEIN, a/k/a "Mike Konig,"
ARYEH "ARI" BROMBERG,
JOEL WITTELS,
SHLOMO EREZ,
and ALAA HATTAB,**

did knowingly and willfully combine, conspire, confederate, and agree with each other and others to commit an offense against the United States, namely obstruction of justice, contrary to Title 18, United States Code, Section 1503.

In violation of Title 18, United States Code, Section 371.

## ATTACHMENT B

## INTRODUCTION

1. Defendant ELIYAHU ("Eli") WEINSTEIN, a/k/a "Mike Konig," ("WEINSTEIN"), was previously convicted of two separate investment fraud schemes, the first of which he committed from in or around June 2004 through in or around August 2011, and the second of which he committed—while he was on pretrial release—from in or around February 2012 through in or around May 2013. WEINSTEIN's first two investment fraud schemes collectively resulted in losses to investors of approximately $230 million. He was sentenced to serve 24 years in prison for those crimes, followed by a three-year term of supervised release. He was also ordered to pay, in total, $230,406,799 in restitution to the victims of his crimes.

2. On or about January 19, 2021, after WEINSTEIN had served less than approximately 8 of those 24 years, the President of the United States commuted WEINSTEIN's prison sentence to a period of time served, leaving intact the other components of WEINSTEIN's sentence. On January 20, 2021, WEINSTEIN was released from custody and began serving his three-year term of supervised release under the supervision of the United States Probation Office.

3. Soon after WEINSTEIN left prison, he began orchestrating another substantial scheme to defraud investors. Working with co-conspirators—including defendants Aryeh "Ari" Bromberg ("BROMBERG"), Joel Wittels ("WITTELS"), Shlomo Erez ("EREZ"), and Alaa Hattab ("HATTAB") (collectively, with WEINSTEIN, the "Defendants")—WEINSTEIN and others took tens of millions of dollars from investors by: (a) actively concealing WEINSTEIN's identity and role in purported investments; (b) falsely claiming that the funds would be used to invest in lucrative deals involving, among other things, COVID-19 masks, scarce baby formula, and first-aid kits bound for Ukraine; and (c) operating a Ponzi-like scheme by using new investor money to pay off earlier investors. Based on these material misrepresentations and omissions, WEINSTEIN and his co-conspirators defrauded at least 150 individual investors of more than $35 million in investor funds.

4. At the same time, WEINSTEIN and the other Defendants conspired with each other and others to obstruct justice by: (a) hiding WEINSTEIN's assets that should have been used to pay over $200 million in restitution that he still owes his previous victims; and (b) concealing his myriad business activities, which were expressly prohibited by the terms of his supervised release.

## BACKGROUND

5. At all times relevant to this Complaint, unless otherwise indicated:

## WEINSTEIN's Prior Fraud Convictions

a. WEINSTEIN currently resides in New Jersey. On January 3, 2013, WEINSTEIN pled guilty to conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and engaging in monetary transactions from specified unlawful activity, in violation of 18 U.S.C. § 1957. *See* Crim. No. 11-701 ("Weinstein I"). The charges stemmed from a multi-year real-estate fraud scheme that WEINSTEIN orchestrated and used to misappropriate investor funds, resulting in losses of more than $224 million to victims. On February 25, 2014, U.S. District Judge Joel A. Pisano sentenced WEINSTEIN to 22 years' imprisonment, followed by three years of supervised release. On September 2, 2015, U.S. District Judge Anne E. Thompson entered an Amended Judgment ordering WEINSTEIN to pay $224,230,049 in restitution to the Weinstein I victims, which was due immediately.

b. While on pretrial release in Weinstein I, WEINSTEIN committed a second investment fraud scheme involving false and fraudulent representations related to purported investments in securities and real estate. *See* Crim. No. 14-219 ("Weinstein II"). On September 3, 2014, WEINSTEIN pled guilty in Weinstein II to conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, committing wire fraud while on pretrial release, in violation of 18 U.S.C. §§ 1343 and 3147, and engaging in monetary transactions from specified unlawful activity, in violation of 18 U.S.C. § 1957. On December 15, 2014, Judge Pisano sentenced WEINSTEIN to a 135-month prison term, 24 months of which was to run consecutive to the 22-year sentence the court had imposed in Weinstein I, and an additional term of three years of supervised release. On September 25, 2015, Judge Thompson signed an Amended Judgment ordering WEINSTEIN to pay $6,176,750 in restitution to the Weinstein II victims.

c. On or about January 19, 2021, the President of the United States commuted WEINSTEIN's 24-year prison sentence to a period of time served. At the time of his release, WEINSTEIN had served approximately 7 years and 8 months of his total prison term of 24 years. The commutation left intact all other components of WEINSTEIN's sentence, including his obligations to pay restitution to the victims of Weinstein I and Weinstein II.

d. On or about January 20, 2021, WEINSTEIN began serving a three-year term of supervised release. On or about February 24, 2021, Judge Thompson modified the terms of WEINSTEIN's supervised release (the "Judgment Modification"), which prohibited WEINSTEIN from, among other things:

- "encumber[ing] or liquidat[ing] interest in any assets unless it is in direct service of the fine and/or restitution obligation";

- engaging in "any type of employment, or potentially profitable business dealings, in financial groups, investment firms, and/or financial products/instruments whose funds were solicited from individuals recruited by yourself or individuals recruited and procured by your associates";

- participating in any "commercial and/or personal real estate transactions which would result in personal income or potential future earned income during supervised release"; and

- being employed "as a consultant, adviser, investment manager, or investor in any capacity involving any form of real estate transaction, equity purchase, or initial public offering."

WEINSTEIN signed the Judgement Modification, acknowledging that he understood these restrictions.

e. To date, WEINSTEIN has paid approximately $1,653,413.32 in restitution and has approximately $228,753,385.68 outstanding.

### The Other Defendants, Relevant Entities, and Co-conspirators

f. The Defendants and their co-conspirators principally perpetrated their fraud through two New Jersey entities: (i) Optimus Investments Inc. ("Optimus"), which purportedly financed the purchase and sale of medical supplies and other goods; and (ii) Tryon Management Group LLC ("Tryon"), whose primary purpose was to raise capital from investors to finance Optimus's purported transactions.

g. WEINSTEIN was a silent partner in Optimus, an entity which he and his co-conspirators used to solicit and obtain money from investors.

h. BROMBERG resided in New Jersey, served as a co-owner of Optimus, and was a signatory on Optimus's primary bank account, ending in 7976 (the "Optimus Account").

i. WITTELS resided in New Jersey and served as a co-owner of Optimus. He handled accounting for Optimus and was a signatory on the Optimus Account.

j. EREZ was a citizen of Israel and purported to serve as WEINSTEIN's attorney and business partner. EREZ purchased properties and

6

controlled bank accounts for WEINSTEIN's benefit. EREZ was the sole signatory on a bank account ending in 5381 (the "Erez Account").

      k.    HATTAB was a United States citizen residing in Canada and purported to serve as a broker for WEINSTEIN and Optimus on deals for medical supplies and other goods. HATTAB owned approximately 51% of Saniton Plastic LLC ("Saniton Plastic"), a bottling company which, according to its website, created "interlocking bottle technology" that "reduces up to 35% of carbon emissions." Until in or around August 2022, HATTAB and WEINSTEIN had an unwritten agreement that allowed WEINSTEIN to be a 49% owner of Saniton Plastic. HATTAB also used the entity Hattab Global Corporation ("Hattab Global") to purchase goods for purported deals involving Tryon, Optimus, and WEINSTEIN.

      l.    Co-conpsirator-1 ("CC-1") and Co-conspirator-2 ("CC-2," with CC-1 and the Defendants, the "Conspirators") co-owned Tryon and are both co-conspirators not charged in this Complaint. In or around late August 2022, HATTAB, at WEINSTEIN's direction, transferred WEINSTEIN's 49% stake in Saniton Plastic to CC-1 and CC-2.

### Other Relevant Entities and Individuals

      m.    The United States Agency for International Development ("USAID") is a federal agency that leads the United States Government's international development and disaster assistance through partnerships and investments.

      n.    U.S. Customs and Border Protection ("CBP") is a federal government agency responsible for, among other things, border management and control, customs, immigration, border security, and agricultural protection.

      o.    Company-1 and Company-2 were each entities that could purportedly purchase medical supplies in bulk and at a discount.

      p.    Financial Institution-1 is a large financial institution where Tryon and Optimus each had bank accounts.

### THE SCHEME TO DEFRAUD

### Obtaining Investor Money by Concealing WEINSTEIN's Identity from Investors

      6.    Since at least in or around December 2021, less than one year after the commutation of his sentence and release from prison, WEINSTEIN was actively involved in operating Optimus in the shadows. To conceal his identity and control of

7

the company, WEINSTEIN used an alias, "Mike Konig," when communicating with lenders, potential investors, and business partners.

7. To further the deception, BROMBERG and WITTELS served as the nominal owners of Optimus on corporate documents, checks, corporate bank accounts, and investor documents. In reality, BROMBERG and WITTELS took direction from WEINSTEIN on business transactions, including where and when to move money.

8. Based on the material misrepresentations and omissions about WEINSTEIN's business activities and his history of fraud, WEINSTEIN and the Conspirators solicited and obtained tens of millions of dollars from Optimus and Tryon investors.

### Obtaining Investor Money Through Optimus and Tryon: Promises of Lucrative Deals and Substantial Returns

9. In or around late 2021, Optimus started raising money directly from a small number of investors to finance purported transactions related to COVID-19 medical supplies. CC-2 was one of Optimus's initial investors.

10. In or around January 2022, BROMBERG and WITTELS began asking CC-2 for more money to purportedly finance larger transactions for medical supplies. Soon after, CC-1 and CC-2 formed Tryon to raise money from individual investors to finance these deals for Optimus.

11. BROMBERG and WITTELS knew WEINSTEIN and were familiar with his fraud convictions. They initially worked with WEINSTEIN to conceal WEINSTEIN's true identity from CC-1 and CC-2, because they knew CC-1 and CC-2 were raising money for Optimus's supposed deals from individual investors who would not invest if they were aware of WEINSTEIN's fraud convictions and his significant role at Optimus. To further this deception, BROMBERG and WITTELS introduced WEINSTEIN to CC-1 and CC-2 as "Mike Konig," and WEINSTEIN communicated directly with CC-1 and CC-2 as Mike Konig, using an internet-based messaging application (the "Messaging Application").[1]

12. WEINSTEIN, posing as Mike Konig, provided CC-1 and CC-2 a purported framework for sourcing and funding deals: Optimus would finance or purchase medical supplies and related products and resell them to a third party for a profit, which Optimus would then split with Tryon for the benefit of their

---

[1] The Messaging Application was a multiplatform messaging service that enabled users to chat directly or in groups using text, voice, and video.

investors. Mike Konig (in reality, WEINSTEIN) would find the deals through his various relationships and would get a cut of the supposed profits.

13. Based on this framework, CC-1 and CC-2 solicited investors through Tryon. Most of the investors were CC-1's and/or CC-2's family, friends, or close associates.

14. Tryon provided investors with notes promising outsized returns, many of which had an interest rate of 48%, an additional "equity" return of between 2% and 10%, and a full return of an investor's principal investment, all within three to six months. The promissory notes also generally included payout schedules, which often listed purported monthly distributions to investors of interest, equity, and principal (the "Monthly Distributions").

15. Tryon sent investors updates that described "Mike Konig" as its "Logistics Coordinator and Purchase Order procurement officer." The updates touted Mike Konig's track record of brokering large contracts involving millions of units of COVID-19 medical supplies and other similar products.

16. BROMBERG, WITTELS, and WEINSTEIN (posing as Mike Konig) provided information to CC-1 and CC-2 about the various Optimus deals for potential and existing Tryon investors. Investors transferred their money to Tryon based on these collective representations about the Optimus deals and the continued concealment of WEINSTEIN's involvement in the deals and his history of fraud.

17. In or around January 2022, CC-1 and CC-2 began sending money from Tryon investors directly to Optimus through the Optimus Account.

### Obtaining and Using Investor Money to Pay Other Investors

18. Almost immediately after Tryon started accepting investors' money and transferring it to Optimus, WEINSTEIN's purported deals were not generating the promised returns, and Tryon was unable to pay Monthly Distributions owed to investors.

19. Rather than reveal this information to investors, CC-1 and CC-2 agreed with WEINSTEIN (posing as Mike Konig), BROMBERG, and WITTELS to pool money from existing investors of both Optimus and Tryon and use it to make monthly payments to other investors in a Ponzi-like fashion (the "Ponzi Scheme"). Beginning in or around February 2022, WEINSTEIN (posing as Mike Konig), WITTELS, BROMBERG, CC-1, and CC-2—in person or using the Messaging Application—frequently discussed upcoming capital calls and how Tryon and Optimus could cover the capital calls with money from other investors.

20. For example, on or about February 23, 2022, BROMBERG and CC-2 had the following exchange using the Messaging Application, in which CC-2 thanked BROMBERG for using money from Optimus investors to make payments to Tryon investors:

> CC-2: It means a LOT that Optimus scraped the money together to pay my investors . . . . I really really appreciate that.
>
> BROMBERG: Of course we[']re a f*cking team buddy[2]

21. In or around the same time, BROMBERG, WITTELS, CC-1, and CC-2 concealed this Ponzi-like arrangement from investors by falsely telling investors that the Monthly Distributions derived from legitimate investment returns, not other investors' money.

22. Similarly, in or around May 2022, CC-1 and CC-2, at BROMBERG and WITTELS's request, provided funds from Tryon investors to pay Optimus investors, because supposed deal profits had not materialized. Instead of truthfully disclosing this information to Optimus investors, BROMBERG and WITTELS sent investors false statements indicating that the payouts were "profits" from specific deals.

23. The Ponzi Scheme continued throughout the relevant period of the conspiracy as Optimus repeatedly failed to generate promised returns and Tryon and Optimus were unable to pay distributions to investors.

### Purported Deals That WEINSTEIN Used to Obtain Investor Money

24. Although there were little or no profits from WEINSTEIN's purported deals, Tryon and Optimus continued to solicit and receive millions of dollars from investors based on new supposed deals from WEINSTEIN. For at least the following three deals, WEINSTEIN (posing as Mike Konig) provided CC-1 and CC-2 fraudulent documents and information to mislead investors and make the deals appear legitimate.

#### *The First-Aid Kit Deal*

25. In or around May 2022, WEINSTEIN (posing as Mike Konig) asked CC-1 and CC-2 to raise money from investors to finance the purchase and delivery

---

[2] The communications provided here and below are quoted verbatim, except for the bracketed text, ellipses, and asterisks.

of three million first-aid kits ("FAKs") to USAID to be distributed to the people of Ukraine during the Russia-Ukraine war (the "FAK deal").

26. WEINSTEIN (posing as Mike Konig) provided CC-1 and CC-2 information concerning the FAK deal to help raise money from potential investors, including documents and information purporting to show that:

    a. Optimus would acquire three million FAKs from Company-1 and resell them to Company-2 for a profit;

    b. HATTAB was a broker for the FAK deal;

    c. the FAKs would ultimately be distributed to a service-disabled veteran organization that had a contract with USAID; and

    d. the FAK deal would generate profits of approximately $84,750,000.

27. In or around June 2022, CC-1 and CC-2 provided this information to potential investors in an executive summary, which CC-1 and CC-2 used to raise millions of dollars for the FAK deal. At WEINSTEIN's direction (posing as Mike Konig), CC-1 and CC-2 sent those funds to Optimus using various bank accounts.

28. However, USAID representatives never heard of Company-1 or Company-2, and nobody associated with USAID had ever agreed to buy any of these first aid kits. The entire FAK deal was fake.

### *The N95 Mask Deal*

29. In or around May 2022, WEINSTEIN (posing as Mike Konig), asked CC-1 and CC-2 to raise additional money to finance Company-1's purchase of 100 million N95 masks (the "N95 Mask deal"). Relying on this information, CC-1 and CC-2 raised money from investors for the N95 Mask deal and sent at least approximately $2.5 million to Optimus for that purpose.

30. In a subsequent conversation that was audio recorded without WEINSTEIN's knowledge, WEINSTEIN admitted that he diverted Tryon investor money intended for the N95 Mask deal to invest in the Turkish stock market.

### *The Baby Formula Deal*

31. Similarly, in or around early August 2022, WEINSTEIN (posing as Mike Konig) asked CC-1 and CC-2 to raise money to finance the purchase of approximately 29 shipping containers of baby formula from HATTAB's company, Hattab Global, in order to capitalize on supply chain issues which had created a

shortage in baby formula (the "Formula deal"). WEINSTEIN provided documents to CC-1 and CC-2 for potential investors, including approximately 29 bills of lading ("BOLs") showing that the formula had been shipped from Turkey to Newark, New Jersey.

32. Relying on these documents, CC-1 and CC-2 raised millions of dollars from Tryon investors for the Formula deal.

33. Records obtained from CBP, however, revealed that the BOLs were fabricated and altered, with no actual shipments corresponding with the information on the BOLs.

34. In a subsequent meeting that was audio recorded without WEINSTEIN's knowledge, WEINSTEIN, in the presence of HATTAB and BROMBERG, told CC-1 and CC-2 that the BOLs were false, and that WEINSTEIN took full responsibility for those false BOLs.

### WEINSTEIN Discloses His Real Identity to CC-1 and CC-2, and the Conspirators Discuss Their Criminal Conduct.

35. In or around late August 2022, the Conspirators had a series of meetings in which WEINSTEIN revealed his true identity to CC-1 and CC-2. In these meetings, WEINSTEIN also admitted to making various false statements about purported Optimus deals and to misappropriating Tryon investor money. The other Conspirators likewise openly discussed defrauding investors.

#### *August 26, 2022 Meeting*

36. On or about August 26, 2022, WEINSTEIN, BROMBERG, HATTAB, CC-1, and CC-2 met in a hotel conference room in or around Branchburg, New Jersey. Law enforcement obtained a surreptitious audio recording of that meeting.

37. During the meeting, WEINSTEIN stated to CC-1 and CC-2, "I can't do this with 'Mike [Konig]' anymore. I am Eli Weinstein." As discussed above, WEINSTEIN also admitted that (a) the BOLs for the Formula deal were false, and (b) he diverted money from the N95 Mask deal for other purposes, including to invest in the Turkish stock market.

38. Moreover, at the end of the meeting, CC-1 and BROMBERG explicitly discussed the criminal nature of the scheme:

> CC-1: Ari [BROMBERG], here's the pressure. On October 11th . . . we default on 35 million, we have a really big problem. And when this house of cards falls – if this house of cards falls, and

|  |  |
|---|---|
|  | you don't do what you– and you guys can't perform, and I can't perform, the risk is you didn't tell us who Mike [Konig] was. You and Joel [WITTELS] introduced us to Eli [WEINSTEIN], as Mike. |
| BROMBERG: | Right. |
| CC-1: | You concealed a criminal – when this conversation happens, in a court room, with depositions – |
| BROMBERG: | Forget it. Then everyone goes down. |

*August 29 and 31, 2022 Meeting*

39.  On or about August 29 and 31, 2022, WEINSTEIN, WITTELS, BROMBERG, EREZ, and CC-2 met in a hotel conference room in or around Allentown, Pennsylvania. Law enforcement obtained surreptitious audio recordings of these meetings.

40.  During the August 29 meeting, WEINSTEIN explicitly told EREZ and WITTELS, who were not present at the August 26 meeting, that the Conspirators were all agreeing to continue concealing WEINSTEIN's identity from investors and others. WEINSTEIN stated, "[CC-2] looked at me in the eyes, looked at us all in the eyes with [CC-1], before you were here Joel [WITTELS] and Shlomo [EREZ] . . . and we had a bond that so long as we try our best to be completely . . . . transparent, and ensure that no one gets hurt . . . then we will keep it [i.e., WEINSTEIN's identity] in the room."

41.  During the August 31 meeting, when discussing purported Optimus deals, WEINSTEIN admitted that he "misrepresented specific things" and "misled" and "lied about transactions." WEINSTEIN also acknowledged that the FAK deal did not happen but claimed HATTAB misappropriated the money for Saniton Plastic. WEINSTEIN also admitted to engaging in the Ponzi Scheme, stating, "I finagled, and Ponzied, and lied to people to cover us."

42.  WEINSTEIN and BROMBERG acknowledged that investors would not have invested if they knew WEINSTEIN's true identity and that concealing his identity was essential to obtaining investor money:

|  |  |
|---|---|
| WEINSTEIN: | There's another problem. We collectively did not tell everyone who I was, no one would ever give |

>           you a penny if they knew who I was . . . because
>           I have a bad reputation.
>
> BROMBERG:  Correct.

43.   During the same meeting, EREZ emphasized the need for the Conspirators to stick together, stating, "What I am saying is now I understand the whole picture and the best way is to work as a group."

### The Conspirators Agree to Continue Defrauding Investors

44.   Both during and after these August 2022 meetings, the Conspirators agreed to continue concealing WEINSTEIN's identity from investors and to raise additional money to pay off existing Tryon investors, all in an effort to stop the Ponzi Scheme from falling apart and to cover up the Defendants' fraud.

45.   Consistent with that plan, CC-1 and CC-2, with the Defendants agreement and urging, misled and concealed material facts from investors, including that:

   a. Mike Konig was actually WEINSTEIN and had a history of fraud;

   b. WEINSTEIN was the source of nearly every purported deal that formed the basis of Tryon's investments;

   c. WEINSTEIN admitted to having provided false and misleading information about several of those deals;

   d. WEINSTEIN misappropriated Tryon investor money for other purposes; and

   e. Neither Tryon nor Optimus could account for where and how WEINSTEIN spent investor money.

46.   As part of their plan to cover up the Ponzi Scheme, WEINSTEIN directed HATTAB to transfer WEINSTEIN's stake in Saniton Plastic to CC-1 and CC-2, with the hope that Saniton Plastic would succeed as a business and generate enough profits to cover the tens of millions of dollars that WEINSTEIN misappropriated from investors through the scheme. HATTAB asked CC-1 and CC-2 to raise more money from investors for Saniton Plastic, while also telling CC-1 and CC-2 to continue concealing from investors WEINSTEIN's identity and association with Saniton Plastic. From in or around August 2022 through in or around October 2022, CC-1 and CC-2 transferred approximately $2.7 million from Tryon to Saniton Plastic, into an account controlled by HATTAB. The $2.7 million

was derived from new investor money as well as money from existing investors who had invested in other deals for purported medical supplies. CC-1 and CC-2, in keeping with HATTAB's request, concealed material facts from these investors, including WEINSTEIN's identity, his association with Saniton Plastic, and the scheme to use future profits from Saniton Plastic to cover up the Ponzi Scheme.

47. To date, Saniton Plastic has generated no profits, despite using millions of dollars of investor money from Tryon for purported equipment and to fund lavish trips by HATTAB, and CC-1 to Turkey and elsewhere to promote Saniton Plastic.

### EREZ's Participation in the Scheme

48. As part of the scheme to defraud investors, EREZ, among other things, helped conceal WEINSTEIN's true identity by receiving investor money on WEINSTEIN's behalf. For example, an analysis of the Optimus Account showed that from on or about December 16, 2021 to on or about May 20, 2022, Optimus sent approximately $12.3 million to the EREZ Account, at least some of which was derived from Tryon and Optimus investors.

49. Similarly, EREZ, at WEINSTEIN's direction, provided CC-1 and CC-2 with a list of purported assets, which EREZ controlled for WEINSTEIN. EREZ knew that CC-1 and CC-2 would use this list of assets to reassure Tryon investors and prevent them from asking for their money back. EREZ also knew that Tryon did not control these assets, nor did the assets secure investors' money. Relying on EREZ's list of assets, on or about November 21, 2022, CC-1 and CC-2 wrote a false and misleading update to Tryon's investors, which stated that Tryon had "collected some significant assets as collateral to make sure that we collectively have more than enough to cover the money we have borrowed" including, among other things:

   a. "$8 million equity [in a] Florida Penthouse";

   b. "$10 million equity [in a] Florida TimeShare";

   c. a "$1.4 million Jackson, NJ house";

   d. "$30 million [in] Saniton Plastic Production Lines"; and

   e. "[$]60 million in pledged assets with our partners at Optimus Investments as Guarantees on Payments."

50. In truth, other than a residential property in Jackson, New Jersey, the Defendants never assigned any assets to Tryon that could be used as collateral to protect Tryon investors from losing money.

51.  More recently, in or around March 2023, EREZ drafted a letter on Optimus letterhead that attempted to further quell Tryon investors who were concerned about their increasingly delayed payouts (the "Optimus Letter"). BROMBERG and WITTELS signed the Optimus Letter. EREZ, BROMBERG and WITTELS knew that the Optimus Letter falsely stated, among other things, that: (a) Optimus had "maintained a disciplined and thoughtful investment approach while balancing calculated risks and rewards"; and (b) "During 2020 and into early 2021, . . . Optimus rewarded Tryon by returning those early investments to you together with profits." EREZ, BROMBERG and WITTELS also knew that the Optimus Letter contained many material omissions about the true nature of the Ponzi Scheme, WEINSTEIN's involvement in the scheme, and the Defendants' misappropriation of investor funds.

52.  By contrast, EREZ and the Conspirators openly referenced their Ponzi Scheme when communicating among themselves. For example, in a Messaging Application chat from on or about November 17, 2022, CC-2 and EREZ had the following exchange:

| CC-2: | Ugh. We got kicked out of [Financial Institution-1] |
| EREZ: | Why? |
| CC-2: | They didn't like the way our account activity was |
| CC-2: | Probably because it looks like a Ponzi scheme |
| EREZ: | Ohh |

## THE OBSTRUCTION CONSPIRACY

### Background

53.  As discussed, the commutation of WEINSTEIN's 24-year prison sentence still left intact the final judgments in Weinstein I and Weinstein II, which required WEINSTEIN to serve three years of supervised release and pay restitution to his victims, the outstanding balance of which totaled more than $228 million dollars (the "Judgments"). As also discussed, in or around February 2021, after WEINSTEIN began serving his three-year term of supervised release, WEINSTEIN signed and acknowledged the Judgment Modification, which precluded WEINSTEIN from engaging in certain business and other activities while on supervised release. These limitations included: (a) liquidating assets, except in service of paying restitution, and (b) playing a role, directly or indirectly, in soliciting money from investors.

54.  When a defendant like WEINSTEIN is placed on supervised release, he must "be supervised by a probation officer," 18 U.S.C. § 3601, who is appointed

16

by and acts "under the direction of" the District Court, 18 U.S.C. § 3602. During a defendant's supervised release, the probation officer must periodically "report" the defendant's "conduct and condition to the sentencing court." 18 U.S.C. § 3603(2). Where appropriate, the District Court has the authority to revoke a defendant's term of supervised release. 18 U.S.C. § 3583.

55. WEINSTEIN has been serving his term of supervised release under the supervision of the U.S. Probation Office in the District of New Jersey ("Probation").

## The Obstruction

56. Despite the clear terms of WEINSTEIN's supervised release, and unbeknownst to Probation or the District Court, since at least in or around December 2021, the Conspirators actively subverted and obstructed the Judgments and the Judgment Modification by: (a) hiding WEINSTEIN's unsanctioned business activities, and (b) hiding and diverting funds and assets that should have gone towards restitution.

### *Obstructing Probation's Official Function*

57. The Conspirators agreed to conceal WEINSTEIN's business activities and role in Optimus, despite knowing that it violated his terms of supervision. As discussed above, the Defendants furthered this scheme by, among other things, making WEINSTEIN a silent partner in their business ventures, opening bank accounts for WEINSTEIN without using his name, and using those accounts to transfer money at WEINSTEIN's direction, while concealing that WEINSTEIN was behind the transfers. And once the Defendants disclosed WEINSTEIN's true identity to CC-1 and CC-2 in August 2022, they all agreed to continue concealing WEINSTEIN's identity and business activities from Probation.

58. As WEINSTEIN stated during the recorded August 26, 2022 meeting, discussed above, "What I say to you is please keep it discreet in this room, so I can help you – help you, help yourselves, because one violation is problematic." WEINSTEIN made this statement in reference to his prohibited business activities and the Defendants' plan to continue those activities to further the Ponzi Scheme.

59. In or around late August 2022, HATTAB and CC-2 had the following exchange over the Messaging Application in which they explicitly discussed the agreement to conceal WEINSTEIN's illicit business dealings from Probation to prevent WEINSTEIN from being sent back to jail:

> HATTAB: You guys didn't call his probation officer did you?
>
> CC-2: How would I know who that is

| | |
|---|---|
| HATTAB: | He's not allowed to do business, the mere fact that he did business would send him back to jail |
| HATTAB: | Ok just making sure |
| HATTAB: | Nobody can know |

60. While the Conspirators agreed to hide this information from Probation and others, they readily acknowledged it to each other. For example, in a recorded phone call on or about April 25, 2023, CC-2 and WITTELS had the following exchange:

| | |
|---|---|
| CC-2: | Did you know that he [WEINSTEIN] wasn't supposed to be doing business? |
| WITTELS: | Yes, I did |

61. By working with WEINSTEIN to conceal his many business activities—all of which explicitly violated the terms of his supervised release—the Defendants obstructed WEINSTEIN's Probation officer's ability to supervise him. The Defendants' obstruction caused WEINSTEIN's Probation officer to, among other things, unknowingly provide false information to the District Court. Specifically, on or about December 15, 2022, because of the Defendants' obstruction, WEINSTEIN's Probation officer reported to the Court that WEINSTEIN was in compliance with his conditions of supervision, including "compl[ying] with [Probation's] efforts to verify the legitimacy of his income and nature of employment." Crim. No. 14-219, D.E. 98.

### *Obstructing the Restitution Judgements*

62. In ordering WEINSTEIN to pay restitution to the victims of Weinstein I and Weinstein II, the Judgements stated, "the defendant shall notify the court and United States Attorney of any material change in the defendant's economic circumstances."

63. As discussed, since at least in or around December 2021, the Defendants conspired to thwart the efforts of both the Court and the United States Attorney to collect restitution and have an accurate picture of WEINSTEIN's economic circumstances.

64. During multiple calls and meetings that were recorded without WEINSTEIN's knowledge, WEINSTEIN admitted that he held a beneficial interest in significant assets nominally controlled by EREZ, including a penthouse in Miami. For his part, EREZ confirmed his control over these assets on WEINSTEIN's behalf.

65. For example, during the recorded meeting on or about August 29, 2022, discussed above, at which CC-2, BROMBERG, WITTELS, and EREZ were present, WEINSTEIN said to EREZ: "Shlomo [EREZ], you control 40 million dollars in real estate, you control many, many millions of investments . . . all under your name or your . . . control." Later in the conversation, WEINSTEIN made clear, in substance, that EREZ secretly controlled these $40 million in assets on WEINSTEIN's behalf, and that the assets were "sellable" real estate properties. But instead of using those assets to pay his Judgments, WEINSTEIN stated that they should be "transferred" to CC-1 and CC-2 who he described as "those that have laid out money[.]"

66. To that end, in or around August 2022, WEINSTEIN directed WITTELS to transfer certain property to CC-1 and CC-2 that WITTELS controlled on WEINSTEIN's behalf. Specifically, in or around February 2022, WITTELS used Tryon investor funds that had recently been transferred into the Optimus Account to secretly purchase a real-estate investment property for WEINSTEIN in Jackson, New Jersey (the "Jackson Property"). Subsequently, on or about October 31, 2022, at WEINSTEIN's direction, WITTELS transferred the entity that owned the Jackson Property to CC-2 for approximately $10.

67. More generally, in multiple conversations that were recorded without WEINSTEIN's knowledge, WEINSTEIN discussed his intent to conceal his various assets from the Government. For example, during the August 26, 2022 meeting, discussed above, WEINSTEIN stated that he had "70 million dollars sitting in a bank account." Speaking to BROMBERG and then addressing the other Conspirators at the meeting, WEINSTEIN said, "you've [BROMBERG] seen my [bank] account? Believe me, just let me get off Probation guys." BROMBERG then confirmed that he had seen WEINSTEIN's account containing approximately $70 million.

68. Likewise, during the recorded August 31, 2022 meeting, discussed above, WEINSTEIN and other Defendants discussed the need to conceal WEINSTEIN's financial stake in Saniton Plastic:

> WEINSTEIN:   Do you think the feds won't take Saniton away? . . . They absolutely will.
>
> BROMBERG:   They will in a f*cking second.
>
> WEINSTEIN:   No question . . . I'm just saying it's a fact. They're gonna do a claw back on every business deal that I'm going through, every single investment.

69. Similarly, in a recorded phone call with CC-2 on or about April 26, 2023, WEINSTEIN explained that he and the other Conspirators needed to wait until he was off "probation" before transferring WEINSTEIN's secret assets to pay back investors. Referencing his obligation to report such assets to the Government pursuant to the Judgements, WEINSTEIN stated, "Any financial move I make, anything, I have to report." But WEINSTEIN suggested that he could hide assets "if I didn't notify them or they don't know about it."

70. All along, WEINSTEIN knew the consequences of getting caught hiding his assets and the need to keep that information secret. During the August 26, 2022 meeting, he warned other Conspirators: "You can't touch that [referring to hidden assets] . . . because you'll go to jail. . . I just told you something that no one in the world knows because I hid money. Get it?"